UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

LAURA COLLINGE,

 Plaintiff,

v.

MSC CRUISES S.A.,
f/k/a MSC CRUISES (USA) INC.,
 Defendant.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

 Plaintiff LAURA COLLINGE sues Defendant MSC CRUISES, S.A., ("MSC"), and alleges:

**PRELIMINARY ALLEGATIONS**

 1. The Plaintiff, LAURA COLLINGE, is a citizen of North Carolina.

 2. Defendant MSC is a foreign corporation having its principal place of business in Florida.

 3. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332. In the alternative, if diversity jurisdiction does not apply, then this matter falls under the admiralty and maritime jurisdiction of this Court.

  a. Plaintiff demands a jury trial pursuant to the remedies saved under the Saving to Suitors Clause of 28 U.S.C. §1333. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 454-55 (2001) ("Trial by jury is an obvious… example of the remedies available to suitors."); *see also Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1063 (11th Cir. 1996).

1

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .

4. Defendant, at all times material hereto, personally or through an agent:

   a. Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

   b. Was engaged in substantial activity within this state;

   c. Operated vessels in the waters of this state;

   d. Committed one or more of the acts stated in Florida Statutes §§ 48.081, 48.181 and/or 48.193;

   e. The acts of Defendant set out in this Complaint occurred in whole or in part in this county and/or state.

   f. Defendant was engaged in the business of providing to the public and to the Plaintiff in particular, for compensation, vacation cruises aboard the vessel, the MSC *DIVINA*.

5. Defendant is subject to the jurisdiction of the Courts of this state.

6. The causes of action asserted in this Complaint arise under the General Maritime Law of the United States.

7. At all times material hereto, Defendant owned, operated, managed, maintained and/or controlled the vessel, the MSC *DIVINA*.

8. On or about December 11, 2017, the Plaintiff was a paying passenger on Defendant's vessel, the MSC *DIVINA*, which was in navigable waters.

9. MSC owed Plaintiff a duty to act reasonably under the circumstances with regard to her safety. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).

**The Circumstances**

10. MSC claims to have "unparalleled maritime expertise based on 300 years of seafaring tradition."

11. MSC states:

    a. The MSC Safety Management System "seeks constant process and program improvement."

    b. It is "committed to excellence, professionalism and dedication."

    c. "The safety … of our guests … will always be our number one priority."

12. MSC and the *Divina* had many certifications from Bureau Veritas, ISO, and OHSAS related to, among other things, passenger and crew safety.

13. A core concept of the OHSAS 18001 Certification is, "Plan, Do, Check, Act."

14. That OHSAS concept is similar to the "continual improvement" concept embodied in the ISO 9001 Certification held by MSC and the *Divina* and the quality management system ("QMS") used aboard the *Divina*.

15. ISO 9001 is an industry standard that sets requirements for a QMS that helps businesses be more efficient and improve customer satisfaction.

16. A QMS is a way of defining how a business meets the needs of its customers and others affected by the business.

17. ISO 9001 is based on the idea of continual improvement.

18. ISO 9001 certified businesses must analyze their operations and determine how to continually improve operations for the benefit of customers and the public.

19. Businesses using an ISO 9001 QMS must assess their operations and identify, define, and address areas needing improvement.

20. ISO 9001 businesses put the customer first and ensure the customer's needs are

being met.

21. ISO 9001 businesses identify and address the risks associated with their operations.

22. ISO 9001 businesses focus on risk-based thinking.

23. The identification and correction of risks associated with the business is a key aspect of ISO 9001 certification.

24. MSC and the *Divina* also have many other certifications related to the safe operation of its business and ships like ISO 14001, ISO 22000, Pearl ISO 50001, and many others.

25. All of those certifications show MSC was aware of, and undertook to comply with, many industry standards applicable to human safety aboard its ships, one of which was the *Divina*.

26. MSC has known for many years before Plaintiff's cruise that slipping hazards on the decks of its ships are a constant source of injury to passengers aboard the ships.

27. MSC has known for many years before Plaintiff's cruise that industry standards require ships to have safe, slip-resistant walking surfaces in areas like where Plaintiff was injured on the ship.

28. MSC has known for many years before Plaintiff's cruise that quick identification and removal of slipping hazards on its ships is a reasonable way to protect against slip and fall injuries.

29. Despite MSC's claim that it is constantly improving the safety and operation of its ships, MSC has not improved the safety of its decks and protecting passengers on board from slipping hazards. The following is just a sample of the numerous passengers who have been

4

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .

injured by slipping hazards on the decks of MSC's ships.

30. Between 2001-2005, MSC built and put into service its Lirica class of ships consisting of the *Armonia*, *Sinfonia*, *Lirica*, and *Opera*.

31. On or about February 15, 2007, Sue McDonald slipped and fell on a slippery wet substance on a deck of the MSC *Lirica*.

32. On or about April 15, 2007, Judith Lagasse slipped and fell on a slippery wet substance on a deck of the MSC *Lirica*.

33. On or about January 4, 2009, Mary Chappel slipped and fell on a slippery wet substance on a deck of the MSC *Lirica* near a food area.

34. Between 2006-2010, MSC built and put into service its Musica class of ships consisting of the *Musica, Orchestra, Poesia,* and *Magnifica.*

35. Based on MSC's statements and certifications, MSC's knowledge and experience would have gone into improving this most recent class of vessels over the last class. Based on MSC's statements and certifications, MSC was constantly improving its operation of it ships and safety rules to protect passengers aboard its ships better than it did on earlier ships. Apparently, that didn't happen because passengers kept slipping and falling on MSC ships.

36. On or about March 26, 2009, Vincenza Piergiovanni slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra*.

37. On or about April 15, 2009, Rafael Santisteban slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra*.

38. On or about April 8, 2010, Leonor Olano slipped and fell on a slippery wet substance on a deck of the MSC *Orchestra*.

39. On or about November 16, 2011, Fred Bill slipped and fell on a slippery wet

substance on a deck of the MSC *Poesia*.

40. On or about February 14, 2013, Sharon Betterman slipped and fell on a slippery deck near a food area on the MSC *Poesia*.

41. Between 2008-2013, MSC built and put into service its Fantasia class of ships consisting of the *Fantasia, Splendida, Divina,* and *Preziosa.*

42. Based on MSC's statements and certifications, MSC's knowledge and experience would have gone into improving this most recent class of vessels over the last class. Based on MSC's statements and certifications, MSC was constantly improving its operation of it ships and safety rules to protect passengers aboard its ships better than it did on earlier ships. Apparently, that didn't happen because passengers kept slipping and falling on MSC ships.

43. On or about November 24, 2013, Olga Rosales slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

44. On or about December 11, 2013, Michelle Parker slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

45. On or about January 9, 2014, Mike Shaver slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

46. In the Shaver case, MSC resisted revealing the true extent of how many passengers MSC injures in slip and falls on its ships. It finally admitted to twelve other victims in answers to interrogatories in the Shaver case. It appears the number is much higher than that.

47. On or about April 19, 2014, Lidia Laurita slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

48. On or about September 14, 2014, Martin Cohen slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

49. On or about September 24, 2014, Hilda Ruiz slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

50. On or about October 25, 2014, Beverly Michilin slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

51. On or about March 25, 2015, Gilma Velandia slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

52. On or about April 12, 2015, Aida Montaine slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

53. On or about January 29, 2016, Constance Dillon slipped and fell on a slippery wet substance on a deck of the MSC *Divina*.

54. On or about March 31, 2016, Soo Ko slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

55. On or about May 21, 2016, Richard Rotti slipped and fell on a slippery wet substance on deck seven of the MSC *Divina*.

56. On November 6, 2016, Josefa Rado-Perez slipped and fell on a slippery deck on the MSC *Divina*.

57. On or about December 31, 2016, Alina Salum slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

58. On or about March 23, 2017, Margaret Anne Haiser slipped and fell on a slippery wet substance on deck fifteen on the *Divina*.

59. On or about April 1, 2017, Deborah Armstrong slipped and fell on a slippery wet substance on deck fourteen of the *Divina*.

60. On or about April 30, 2017, Nardine Aziz slipped and fell on a slippery wet

substance on deck fourteen of the MSC *Divina*.

61. On or about June 18, 2017, Santhia Olivier slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

62. On or about September 1, 2017, Sylvia Bauerschmidt slipped and fell on a slippery wet substance on deck fourteen of the MSC *Divina*.

63. On or about October 30, 2017, Corrine Piccinetti slipped and fell on a slippery wet substance on deck fourteen of the *Divina*.

64. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC has not responded appropriately to the disturbing trend of passengers being injured in slip and falls on its ships.

65. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC still uses decking materials that are unreasonably slippery.

66. Despite all of MSC's claims of maritime expertise, attention to safety, and industry certifications, and constant improvement, the facts show MSC still uses unreasonably dangerous practices regarding finding and removing slipping hazards on its ships.

67. MSC's Passenger Injury Statement tells you exactly where MSC's head is with regard to passengers who are injured on its ships. It asks the passenger to indicate:

> **I blame the accident on**
>
> **[ ] My self**
>
> **[ ] No one was to blame**
>
> **[ ] Other (plese specify)**

68. MSC encourages the passenger to take the blame, then blame nobody, or if the

passenger is not too overcome by pain, shock, and injury, then to have the presence of mind to write in and assign blame to MSC. Those aren't typos above. MSC apparently doesn't take the time to check the spelling of the words on its forms.

69. Before Plaintiff was injured, MSC knew liquids and food were constantly being spilled on the decks of its ships.

70. Before Plaintiff was injured, MSC told the workers on its ships to look for slipping hazards on the deck and clean them. For example, as far back as May 15, 2004, MSC issued a fleet-wide housekeeping bulletin as part of its Standard Procedure Manual warning of the slipping hazard created by wet decks on MSC's ships.

71. MSC was involved in the design of the ship and her decks.

72. MSC was involved in the selection of the deck coverings used on the ship.

73. MSC inspected, accepted, and approved the *Divina* and her deck where Plaintiff was injured, before the ship was placed into service.

74. The material used on deck fourteen of the *Divina* where Plaintiff was injured was unreasonably slippery.

75. MSC created and implemented the deck safety policies used on the ship that failed to protect Plaintiff from the slipping hazard.

76. The circumstances show MSC knew or should have known the decks of its ships were unreasonably slippery, but MSC failed to correct that problem.

77. The circumstances show MSC knew or should have known it had a serious problem with passengers slipping and falling on its ships, but MSC failed to correct that problem.

78. The circumstances show MSC knew or should have known its deck safety

9

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .

policies were unreasonably dangerous, but MSC failed to correct that problem.

79. The circumstances show MSC knew or should have known of the slipping hazard that injured Plaintiff before she slipped and fell, but MSC failed to correct that problem.

## **MSC Injures the Plaintiff**

80. On or about December 11, 2017, the Plaintiff was severely injured when she slipped and fell on an unreasonably wet, slippery and/or hazardous flooring surface while walking on deck fourteen of the *Divina* near the staircase adjacent to the pool.

81. The wet and unreasonably slick, slippery and/or hazardous nature of the flooring surface was not open and obvious and the Plaintiff had no way of knowing the existence of the hazardous condition.

82. After falling, Plaintiff was laying in the walkway in agony as other passengers were attempting to walk over her to get through the walkway.

83. None of the *Divina*'s crew assisted Plaintiff until another passenger requested a deckhand to call for a medic, which took approximately twenty minutes as Plaintiff laid on the deck in excruciating pain.

## **COUNT I – NEGLIGENCE**

Plaintiff realleges, adopts, and incorporates by reference the allegations in paragraphs one (1) through eighty-three (83) as though alleged originally herein.

84. It was the duty of Defendant to provide the Plaintiff with reasonable care under the circumstances.

85. On or about December 11, 2017, Defendant and/or its agents, employees and/or crewmembers breached its duty to provide the Plaintiff with reasonable care under the circumstances, through the following acts and/or omissions:

10
LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.

a. Failure to maintain the subject area in a clean and dry condition; and/or

b. Failure to adequately and regularly inspect and/or monitor the subject area for wet, dirty, and/or slippery conditions; and/or

c. Failure to regularly and adequately clean the subject area; and/or

d. Failure to close off and/or place warning signs on or around the wet and/or slippery areas on the deck; and/or

e. Failure to warn Plaintiff of the wet and/or slippery condition of the subject area; and/or

f. Failure to warn Plaintiff of the risks and/or dangers associated with the wet and/or slippery condition of the subject area; and/or

g. Failure to warn that the walkway surface becomes unreasonably hazardous when wet; and/or

h. Failure to warn passengers and Plaintiff of other slip and fall accidents previously occurring in the same area and/or type of flooring surface; and/or

i. Failure to adequately and regularly monitor a walkway area so as to maintain it in a clean and dry condition; and/or

j. Failure to instruct passengers and the Plaintiff concerning footwear; and/or

k. Failure to promulgate and/or enforce adequate policies and procedures to ensure that the subject area is adequately and regularly inspected, monitored, cleaned and maintained free of wet and/or slippery conditions; and/or

l. Failure to promulgate and/or enforce adequate policies and procedures to ensure that warnings signs are placed on or around wet and/or slippery areas and/or that such wet and/or slippery areas are closed off; and/or

m. Failure to analyze prior slip-and-fall accidents aboard Defendant's vessels occurring in the same area and/or type of flooring surface so as to remedy such hazardous conditions; and/or

n. Failure to correct hazardous conditions following other slip and fall accidents on the same area, same deck and/or same flooring surface; and/or

o. Failure to close off access to the area where Plaintiff suffered her incident until the dangerous and/or hazardous condition(s) which caused her incident was corrected, modified, and/or eliminated; and/or,

p. Failure to retrofit flooring surface in light of the anticipated traffic and anticipated purpose of the area; and/or

q. Failure to test and/or adequately evaluate flooring surface in light of the anticipated traffic and anticipated purpose of the area and/or likelihood of becoming wet, before opening the subject floor to passengers and Plaintiff; and/or

r. Failure to adequately test the coefficient of friction and slip resistance of the subject flooring surface in light of its anticipated use and/or likelihood of becoming wet, before opening it up to passengers and Plaintiff; and/or

s. Failure to utilize reasonably safe flooring surface in light of the anticipated traffic and anticipated purpose of the deck; and/or

t. Failure to have a non-slip or non-skid flooring surface on or around the subject area; and/or

u. Failure to place rubber mats or other non-slip coverings or substance on or around the subject area; and/or

v. Failure to ascertain the cause of prior similar accidents happening on any of the

    Defendant's vessels, fleet wide, so as to take adequate measures to prevent their reoccurrence, and more particularly Plaintiff's incident; and/or all of which caused and/or contributed to the Plaintiff becoming injured when she fell on the subject flooring.

  w. Other acts or omissions constituting a breach of the duty to use reasonable care under the circumstances which are revealed through discovery.

86. All or some of the above acts and/or omissions by Defendant, its agents, employees and/or crewmembers, directly caused and/or contributed to the Plaintiff being severely injured.

87. At all times material, Defendant violated the International Safety Management Code's goals and intent and failed to have properly, adequately and safely implement the International Safety Management Code and by extension its own SQM Manual. In other words, Defendant violated its own policies and procedures which were required to have been implemented and followed pursuant to the ISM Code.

88. At all times material hereto, Defendant knew of the foregoing conditions causing the Plaintiff's incident and did not correct them, or the conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them. Insofar as it relates to conditions that Defendant did not create, Defendant's knowledge was or should have been acquired through prior incident(s) and/or through its maintenance and/or inspections of the subject area.

89. As a direct and proximate result of the negligence of Defendant, the Plaintiff was injured about Plaintiff's body and extremities, suffered physical pain, mental anguish, loss of enjoyment of life, disability, disfigurement, aggravation of any previously existing conditions

therefrom, incurred medical expenses in the care and treatment of Plaintiff's injuries, suffered physical handicap, lost wages, and the Plaintiff's working ability has been impaired. The injuries are permanent or continuing in nature, and the Plaintiff will suffer the losses and impairments in the future. In addition, the Plaintiff lost the benefit of Plaintiff's vacation, cruise, and transportation costs.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law against the Defendant and demands trial by jury.

Respectfully submitted,

LIPCON, MARGULIES,
ALSINA & WINKLEMAN, P.A.
*Attorneys for Plaintiff*
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone No.: (305) 373-3016
Facsimile No.: (305) 373-6204

By: */s/ Jason R. Margulies*
**JASON R. MARGULIES**
Florida Bar No. 57916
E-mail: jmargulies@lipcon.com
**DANIEL W. GRAMMES**
Florida Bar No. 1010507
Email: dgrammes@lipcon.com
**JACQUELINE GARCELL**
Florida Bar No. 104358
Email: jgarcell@lipcon.com